## Garrard et al. v. Heidrick et al.

(Decided Nov. 22, 1935.)

J. SMITH HAYS and J. ASHLAND LOGAN for appellants.

THOMAS D. TINSLEY, J. F. DAVIS, MURRAY L. BROWN, J. J. TYE and ASHBY M. WARREN for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This equity action was commenced on July 13, 1931, by appellants and plaintiffs below filing their petition in the Clay circuit court against appellees and defendants below, wherein they sought to recover of defendants a judgment for the sum of $6,000 with interest and costs. Their cause of action was based upon an alleged right growing out of a certain contract executed on September 11, 1926, by C. C. Smith and W. B. Riley, members composing the firm of Smith & Riley, wherein they purported to assign, transfer, and pledge to plaintiff E. G. Garrard and his brother, W. T. Garrard, their interest, to the extent of $6,000, in an alleged trust fund which plaintiffs averred was then in the hands of defendants and long past due, but that payment thereof

to them was refused, although it had been many times demanded. At the time of the filing of the petition W. T. Garrard was dead and his only heir and devisee under his will joined E. T. Garrard as plaintiff, but before the cause was submitted she died and by a revivor her personal representative became a joint plaintiff. That writing for convenience and the want of a better name will hereafter be referred to as "the pledge contract." It sprang from and grew out of another written contract of date December 20, 1917, and which for the same reasons we will hereafter refer to as "the construction contract." It was executed between Charles F. Heidrick of the first part; C. C. Smith and W. B. Riley, W. T. and E. G. Garrard, and John C. White, parties of the second part; and L. L. Richardson, party of the third part, and was an agreement growing out of these facts:

Some time prior to its execution (December 20, 1917), Heidrick had embarked in the execution of a project to construct a railroad from a point near Barbourville, Ky. (which was thereafter named Heidrick), to Manchester, Ky., the county seat of Clay county, covering a total distance of some twenty-odd miles, and it was then generally known that the road when constructed would be designated as Cumberland & Manchester Railroad and would be owned and operated by a company, either then or thereafter to be formed under the name of "Cumberland & Manchester Railroad Company." At a point on the line of that railroad it crossed a stream known as "Horse creek," and at which a station was contemplated to be known as "Garrard." Up Horse creek from the contemplated railroad track to its source was about 2½ miles where three smaller streams or branches came together and formed Horse creek. Those branches were named Pawpaw branch, Gregory branch, and Crawfish branch. The three distinct units of parties of the second part to the construction contract owned separately at the head of those respective branches coal lands which they contemplated developing, and which were (omitting fractions) 713 acres owned by Smith and Riley at the head of Pawpaw branch; 369 acres owned by the Garrards at the head of Gregory branch; and 302 acres owned by John C. White at the head of Crawfish branch. The contract to construct the Cumberland & Manchester Railroad, as well as its Horse creek branch running

from Garrard to the head of that branch, had been already let to L. L. Richardson, party of the third part in the construction contract, and the parties of the second part therein agreed to jointly contribute, in proportion to their respective acreages of land, $15,000 towards the cost of constructing the Horse creek branch railroad of 2½ miles; they further agreed to construct from the terminus thereof branches or spurs of trackage running up each of the three branches mentioned to the point of their contemplated coal operations.

In consideration of such agreements by parties of the second part, Heidrick as party of the first part, by section 14 of the construction contract, agreed to superimpose an arbitrary freight rate on designated shipments over the Horse creek branch (not to exceed a named maximum rate) in order to create a fund with which to reimburse parties of the second part for the amounts they contributed toward the $15,000 agreed to be paid by them on the cost of construction of Horse creek branch, as well as to reimburse them for the cost that the spur or switch tracks that they might respectively construct from the head of Horse creek (the end of that railroad) to their contemplated coal operations on their respective lands. Soon after entering into that contract, the Garrards, one of the units of parties of the second part to the construction contract, sold to Smith and Riley, another unit of the second parties to the same contract, their coal lands and all their interest in and to the construction contract, a part of which was the placing of the Horse creek branch line in lien to secure the obligations of Heidrick created by its section 14.

Smith and Riley, and also White, then executed leases on the coal lands they held at the head of the named three branches and their lessees formed operating corporations which built the respective spur tracks referred to, and also contributed and discharged their proportionate parts of the $15,000 toward constructing the Horse creek branch. It was expressly agreed in the construction contract, and so alleged in the petition in this case, that the arbitary rates agreed to be imposed therein by Heidrick, as party of the first part, for the purpose mentioned, should at no time exceed an amount permitted by either the Interstate Commerce Commission or the State Railroad Commission, and that if such

permitted imposed arbitrary rates failed to create a sufficient fund to discharge the obligations to the parties of the second part in that contract, then neither Heidrick nor any of his heirs or assigns should ever be held personally liable for any deficit. In other words, the construction contract gave the right to the parties of the second part therein only to require Heidrick to impose such an arbitrary rate as therein agreed upon and no more, since it expressly provided, as stated, that no personal obligation for any deficit in the created fund was assumed by him.

After the sale of their lands by the Garrards to Smith and Riley in 1918, matters ran along, with them out of the picture, until the execution to them of the pledge contract, supra. In the meantime, and on July 31, 1923, an equity action was filed in the Knox circuit court by Smith and Riley, the two Garrards (plaintiffs herein), John C. White, and two mining companies that had taken over some of the lands of some of the parties of the second part in the construction contract, against Heidrick, and three other corporations which had likewise acquired interest in some of such lands. In the petition plaintiffs in that action alleged facts showing their right to an accounting by Heidrick and his associates of the trust fund created by the construction contract, and also an adjustment of the respective proportions of the accumulated fund among the interested parties therein according to the rights created by the construction contract, but which had become diversified or split up by subsequently accruing ones to the various lessees and operators of the lands first owned by parties of the second part to that contract. Practically all the issues involved in this action, with the exception of those created by the pledge contract, supra, were involved, presented, and determined in that case, and which for convenience will be hereafter referred to as the "Smith case."

Upon its final submission, after extensive preparation, the court rendered judgment in which it determined the cost of the construction of each siding or spur track provided for in the construction contract, and also the amounts that each of the parties of the second part to that contract contributed to the $15,000 for the construction of the Horse creek branch. The judgment also found that Heidrick and the Cumberland & Man-

chester Railroad Company to whom he had assigned his holding had theretofore imposed the arbitrary rates provided for in that contract and that the collections therefrom amounted to some $35,000, but which then lacked in the neighborhood of $10,000 of being enough to pay off the debts due to the parties of the second part under the construction contract or to their various assigns. It also found and adjudged the correct percentages of the then and thereafter accumulated trust fund to which all parties interested therein were entitled and it directed the payment of such adjudicated sums to the parties entitled thereto. Partial payments, perhaps, had previously been made, but whether so or not they were subsequently made in accordance with that judgment and the trust fund then on hand was devoted to that purpose with the exception of something like $1,800, and which was the status of affairs at the time the instant action was filed.

Defendants answered denying the material averments of the petition, but admitted the execution of both the construction and the pledge contracts—denying, however, that any of them ever agreed to either accept or pay to plaintiffs any part of the $6,000 mentioned in the pledge contract. Another paragraph of the answer pleaded the judgment rendered in the Smith case as an estoppel and bar to the maintenance of this action by plaintiffs, except to the extent of their right to collect their proportionate part under the Smith judgment of whatever might be due from any undistributed trust fund then in the hands of defendants in this action pursuant to the adjustments made in the Smith judgment. They then admitted that there was such a fund due plaintiffs from all accumulations up to the time of the judgment in this case in the sum of $368.24, for which amount they offered to confess judgment. Various and multiplied replies, rejoinders, and other following pleadings made the issues, and upon final submission, after most extensive preparation, the court rendered judgment in favor of plaintiffs for the amount confessed by defendants in their answer, but dismissed their petition as to any excess amount sought to be recovered, and they have prosecuted this appeal therefrom.

Our somewhat lengthly statement of the origin and history of this litigation, though condensed as much as we could make it, would be greatly extended were we to

endeavor to specifically consider and determine each and all of the many collateral issues and questions injected into the case and argued by counsel. But because of the effect that we have concluded should be given to the res adjudicata or estoppel defense made by defendants in their answer, it will not be necessary for us to pursue the entangled routes created by the injection of such collateral questions, since it is our opinion that the judgement in the Smith case (to which we shall hereafter refer as the ''estoppel judgment'') has the effect to bar plaintiffs' right to recover herein any amount in excess of the judgment rendered in their favor. It follows that such collateral questions fall to the ground and which leaves for determination only the avoidances interposed by plaintiffs to prevent defendants' right to rely on that judgment as an estoppel.

Those avoidances are: (1) That plaintiffs in this case, though also named as plaintiffs in the Smith case, were in fact not parties to that litigation, since it is asserted that the instigators of it used their names as plaintiffs therein without their consent, knowledge, or authority, and for which reason they are not bound by any adjudication rendered therein; (2) that if avoidance (1) should be decided against them, then the estopping judgment could not operate as a bar to their right to maintain this action because the two defendants herein, Cumberland & Manchester Railroad Company and Louisville & Nashville Railroad Company, were not parties to the Smith case and are not bound by the judgment rendered therein, and for which reason plaintiffs also are not bound by that judgment in this action, since it is essential to a valid estoppel that it should be mutual; (3) that the arbitrary rates agreed to be levied by the party of the first part in the construction contract were not confined to freight passing over the Horse creek branch of the Cumberland & Manchester Railroad, but also applied to all freight moving over its entire line from Manchester to Barbourville, and that the proof shows that there were arbitrary rates imposed on the main line of that railroad in addition to those imposed on its Horse creek branch, and that the trust fund should thereby be augmented by the sum realized from such imposition, which, if done, would create a fund largely in excess of the one adjudged in the Smith case, and that because of such fact the sum available to them in that fund was not

limited to the amount of the judgment rendered in their favor, but was sufficiently in excess thereof to extinguish the amount of their claim, and for which reason they should have recovered full judgment, and (4) that defendants herein are themselves estopped to rely on the Smith judgment as a defense herein because it is insisted they orally promised plaintiffs to pay to them the $6,000 mentioned in the pledge contract at the time or before it was executed, and while its negotitation was pending, and that when that promise and agreement was made, defendants knew that plaintiff was relinquishing other liens that they held to secure the same amount.

Before attempting a consideration or determination of any of those questions, we deem it proper to observe that plaintiffs in their pleadings, as well as their counsel in brief filed in this court, make no claim that the stipulated arbitrary rates for the creation of the trust fund provided for in the construction contract were not made, nor is a judgment sought against defendants for any failure on the part of any of them to impose or collect any such rates, and no redress for a violation of that nature is sought. The only contention made by plaintiffs is, that a sufficient rate has been imposed and collected to discharge the obligations of the trust and that the part of it assigned to them under the pledge contract is sufficient to meet and discharge their entire claim arising thereunder. With this explanatory statement, we will now return to a consideration of the enumerated avoidances.

With respect to avoidance (1) assigned as a reason why the estoppel judgment should not apply in this case (i. e., that plaintiffs were not parties to the Smith case with their knowledge and consent), we are convinced that the evidence heard on this trial clearly refutes it. It is true that E. G. Garrard testified that he was not consulted by the other plaintiffs in that litigation, or its promotors, as to the use of his or his brother's name as plaintiffs, but there are a number of uncontradicted facts in the record clearly indicating that he was aware of the pendency of that litigation and that it was being prosecuted in the manner and form employed with his knowledge and consent. In addition thereto, it was proven beyond cavil that his deceased brother and partner, W. T. Garrard, who was then living, knew all about the filing of that action, as well as

400

the purposes for which it was brought and the relief which it sought and acquiesced in the use of the names of himself and brother as plaintiffs therein. Such observations apply only to avoidance (1), but what we shall presently say adversely disposes of it and also avoidances (2) and (3).

The pledge contract (the one as we have seen upon which this action is based) contained this statement: "The money hereby set aside, assigned and transferred unto the said Garrards is to be paid to them as and when the same shall come to be distributed under said contract and the orders of the Knox Circuit Court in the action therein pending wherein C. C. Smith and others are plaintiffs and Chas. F. Heidrick and others are defendants." That provision in the pledge contract unequivocally brought to the attention of the Garrard brothers the fact of the pendency of the Smith case, as well as the relief which is sought. It also advised them that the fund of $6,000 so assigned and pledged to them was not only payable as might be finally directed by the court in that case, but it also informed them that the amount to which they might eventually be entitled was to be measured by the adjudication to be rendered in that case. They, therefore, took no more under the pledge contract than what the final adjudication in that case might determine, and which had the effect to measure their rights by whatever the judgment therein might be. That conclusion eliminates avoidances (2) and (3), conceding that they might otherwise be sustainable. The issues, investigations, and determinations made in the Smith case not only embraced the extent of participation of every interest in the trust fund provided by the construction contract, but likewise embraced what were the arbitrary impositions specified in that contract that were to make up that fund. The estoppel judgment settled those questions and in doing so correctly held that the arbitrary rates provided for in the construction contract applied only to freight passing over the Horse creek branch and not to any that might be imposed for freight traveling over other parts of the Cumberland & Manchester Railroad and which originated at other points on that line.

That conclusion also eliminates the necessity of considering questions of privity, mutuality, and other required elements of an effectual judicial estoppel, all of which are extensively discussed in briefs, but for the

reason assigned it will not be done in this opinion, since they become immaterial and of no avail if what we have already said is correct, and about which we have no doubt. It is sustained, as we conclude, by our recent opinion in the case of Hutcherson v. Louisville & N. R. Co., 247 Ky. 317, 57 S. W. (2d) 12, which defines the character of notice necessary to impute knowledge affecting one's rights, and the rule therein applied was declared by us in the prior cases of Russell v. Petree, 10 B. Mon. 184; Lain v. Morton, 63 S. W. 286, 23 Ky. Law Rep. 438; Everidge v. Martin, 164 Ky. 497, 175 S. W. 1004; Allen v. Ligon, 175 Ky. 767, 194 S. W. 1050; and Martin & Co. v. Maggard & Son, 206 Ky. 558, 267 S. W. 1102. Moreover, under the heading "Acquiescence by one in prosecution of defense in his name," the text in 34 C. J. on page 993 says: "A person will be concluded by a judgment in a suit if, with his knowledge, the suit is commenced and prosecuted, or defended in his name, and judgment rendered therein, without objection on his part."

Plaintiffs herein, as we have seen, not only knew of the pendency of the Smith action, as well as its purpose, but they acquiesced in the use of their names as plaintiffs therein and agreed in their pledge contract to abide by the adjudication that might be rendered in that case. Likewise they knew that whatever excess of the trust fund over and above the amount pledged to them would inure to the benefit of their pledgors, Smith and Riley, and they stood in privity with those two individuals whom they now say were the chief instigators and prosecutors of that case. Without further elaboration, we conclude that the facts, as contained in the record (and which we have related), create the estoppel relied on by defendants and which the court sustained. We will now consider and dispose of avoidance (4), supra, by which plaintiffs seek to sustain their action notwithstanding the conclusions we have thus far expressed.

The fatal fact with avoidance (4) is that it is not sustained by the evidence taken and heard in this case. None of the defendants, nor any of those who might be considered as privies to the others, knew anything about the execution of the pledge contract until some time after it had been executed and delivered. The relinquishment of prior liens that were held by plaintiffs to secure their debt was, therefore, made before any know-

ledge of that contract was brought home to any of the defendants or any of their agents, and, therefore, whatever may have been said by them on the occasion of the acquisition of such knowledge could have no estoppel effect, since plaintiffs' right had already become fixed. What any of them may have said thereafter did not and could not alter the rights acquired by plaintiffs under that contract. However, the testimony fails to show that upon the occasion of defendants acquiring knowledge of that contract any of them made any statement that could be remotely construed into a promise to pay, out of the trust fund or otherwise, any part of plaintiffs' debt as shown in the pledge contract. Some of the testimony tends to show that, possibly, the agent or agents of the corporate railroad defendants may have expressed the view that there would be (no definite time fixed) sufficient trust funds collected under the construction contract to extinguish plaintiffs' debt, arising from the pledged pro rata part of that fund; but there is no testimony in the record going any farther than what we have stated, and, plainly, it is not sufficient to create absolute liability such as this action seeks to enforce.

Counsel for plaintiffs seriously contend that an item of $79.50 incurred by his clients in taking the deposition of the witness J. E. Marks should have been restored to them in the judgment. That contention appears to be made upon the hypothesis that defendants declined to make an accounting, as sought by plaintiffs' motion therefor, and that it was necessary to take the deposition of that witness in order to supply such failure, and because of which it became an item of cost for which plaintiff should be reimbursed; but we do not so construe the record. In the first place, the judgment in the Smith case foreclosed any right of plaintiff to an accounting, except as to the payments that had been made pursuant thereto, and all of which were developed in the pleading. They were entitled also to a manifestation of accumulations of the trust fund since the rendition of that judgment, all of which was done in the pleadings, and the deposition of a witness introduced by defendants furnished all the information that an extended accounting would reveal. The accounting that plaintiffs appear to have desired by their motion therefor related principally to the collection as well as disbursement of imposed arbitrary rates on freight hauled

over other portions of the Cumberland & Manchester Railroad, but in which plaintiff was not entitled to participate. We, therefore, conclude that the court did not err in disallowing to plaintiff this item.

Wherefore, having so concluded, it follows that the judgment was proper, and it is affirmed.